*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0411p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

YOUSIF Z. LAZAR,

*Petitioner,*

No. 06-3380

*v.*

ALBERTO GONZALES,

*Respondent.*

---

On Review from the Board of Immigration Appeals.
No. A72 026 924.

Argued: June 7, 2007

Decided and Filed: August 14, 2007[*]

Before: BATCHELDER and COLE, Circuit Judges; PHILLIPS, District Judge.[**]

---

## COUNSEL

**ARGUED:** Maris J. Liss, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner. John T. Battaglia, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Maris J. Liss, George P. Mann, GEORGE P. MANN & ASSOCIATES, Farmington Hills, Michigan, for Petitioner. Aviva L. Poczter, Patricia A. Smith, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. Petitioner Yousif Lazar seeks review of the decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") decision declaring Lazar's asylum application frivolous. At a hearing in November 2003, Lazar admitted that he made material misrepresentations in his application, including that he was detained and beaten in Saddam Hussein's Iraq. As a result, the IJ declared his application frivolous. Because a finding of frivolousness prevents an alien from obtaining any other relief under the Immigration and Nationality Act ("INA") for which he might otherwise qualify (except for withholding of removal,

---

[*] This decision was originally issued as an "unpublished decision" filed on August 14, 2007. On September 12, 2007, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

which Lazar does not seek), the IJ denied Lazar's application for an adjustment of status based on his marriage to a naturalized United States citizen. For the reasons that follow, we **DENY** Lazar's petition for review.

## I. BACKGROUND

Lazar is a native and citizen of Iraq, who arrived in the United States on May 20, 1999, without being admitted or paroled by an immigration officer. Lazar filed an application for asylum and for withholding of removal on May 4, 2000 ("First Asylum Application"). Subsequently, Lazar also sought to become a permanent resident based on his marriage to a fellow Iraqi émigré, who had become a naturalized United States citizen.

Lazar's original counsel, Robert Dekelaita, assisted him in preparing and filing his First Asylum Application. There, Lazar explained that he was an Assyrian Christian, and therefore part of a minority group that was persecuted in Saddam Hussein's Iraq. Lazar stated that he became involved in the Assyrian Democratic Movement ("ADM") in Iraq in 1991. His brother also had been a member of the ADM but was forced to seek asylum in the United States when his pro-ADM writings got him in trouble. Lazar claimed that he distributed ADM flyers and newspapers in Baghdad in 1996 and 1997, until one day he was arrested along with several other Assyrians, interrogated, and beaten. He was released after being detained for a week, only to be picked up again three days later, and interrogated and beaten. Lazar decided to flee Iraq in 1998, after the ADM distributed particularly vitriolic flyers denouncing Saddam Hussein.

Prior to his asylum hearing on November 14, 2003, Lazar obtained new counsel, George P. Mann, and submitted a second asylum application ("Second Asylum Application"), in which he repeated his allegations of having endured persecution and abuse in Iraq as a result of his political activities.

At the November 14, 2003 asylum hearing, Lazar sought a continuance until his I-130 application for a visa based on his marriage to a naturalized United States citizen could be processed. The IJ noted that he had already granted multiple continuances of Lazar's asylum hearing in anticipation of a decision from the Department of Homeland Security ("DHS") on Lazar's I-130 application. While attempting to find out why Lazar's I-130 application still had not been processed, the IJ stated that he wanted to proceed with the asylum hearing, at least to have Lazar sign his Second Asylum Application.

Noting that Lazar had filed two asylum applications, the IJ explained that although he would consider the "most recent version," Lazar might still be required to account for any differences between them. The IJ then explained the consequences for filing a "frivolous" application:

> Now, sir, if you knowingly file a frivolous application for asylum, you would be barred forever from receiving any benefits under our Immigration Act. Now, this, of course, would mean you could never come back to the United States. And, of course, you could never adjust your status based upon your marriage. A frivolous application for asylum is one which contains statements or responses to questions that have been deliberately fabricated.

(Joint Appendix ("J.A.") 61-62.) In addition to giving these oral warnings, the IJ provided Lazar with written information about filing a frivolous asylum application.

The IJ then asked Lazar whether he had "been over this application that was prepared with the assistance of Mr. Mann, line by line and word for word?" Lazar answered, "[y]es." (J.A. 62.) In response to a question from the IJ about whether he would like to make any changes to his

application, Lazar said no. He answered affirmatively when asked if the application was "entirely accurate." (J.A. 63.) With that, Lazar signed his Second Asylum Application and affirmed to the IJ that "the entire contents of [his] application [were] all true and correct to the best of [his] knowledge and belief." (J.A. 63-64.)

The IJ proceeded to ask Lazar some questions. In response, Lazar testified that he was in Greece for about six months prior to coming the United States, that he was never in Germany, as he reported in his First Asylum Application, and that he entered the United States through Mexico. The Government then questioned Lazar.

In response to the Government's questions, Lazar testified that he grew up in Kirkuk, Iraq. He claimed to have moved to Baghdad in 1991 for school and work and to have lived there continuously until he fled Iraq in 1998. When asked whether he was "absolutely positive" about living exclusively in Baghdad from 1991 to 1998, Lazar stood by his testimony. (J.A. 77.) At this point, the Government handed Lazar a document and asked him whether in fact he was not in Athens, Greece in 1992, where he had applied for refugee status. Ultimately, Lazar made several significant admissions showing that he had not been truthful in his Second Asylum Application, or in his testimony in response to the IJ's and the Government's questions. Lazar admitted that (1) he was in Greece for at least a part of the period in which he claimed to have been in Baghdad; (2) although he stated in his Second Asylum Application that he had never applied for refugee status before, he had in fact applied for such status in the United States, while living in Greece; and (3) his 1997 arrest and detention in Baghdad, which formed the basis for his asylum application, was a fabrication. Lazar further stated that he lied to improve his chances for obtaining asylum and suggested that he had lied upon the advice of his former counsel, Dekelaita. Because of Lazar's submission of a false application, the Government asked the IJ to make a finding that the application was frivolous.

Lazar's counsel, Mann, expressed surprise at his client's admissions and asked the IJ for a continuance to confer with Lazar and assess the situation. The IJ noted that he was familiar with at least one other allegation by a former Dekelaita client that Dekelaita had urged the client to lie in an asylum application. The IJ concluded that he needed to review a pertinent judicial decision on whether a recantation of false statements made in an asylum application would vitiate a frivolous finding, and he urged the parties to review the case as well. The IJ decided to continue the hearing for almost a year, until September 9, 2004, and further gave Lazar thirty days to "come clean" by submitting a filing identifying any other falsehoods in his Second Asylum Application. (J.A. 94.)

On December 12, 2003, Lazar filed a third asylum application ("Third Asylum Application"), apparently in an effort to comply with the IJ's request that he "come clean." The cover letter accompanying Lazar's Third Asylum Application explained that the "factual account is incomplete" but that it would be supplemented with "a full statement as soon as possible." (J.A. 202.) Rather than complete the application, however, Lazar withdrew all his asylum applications on August 18, 2004 and elected to proceed exclusively on his request for an adjustment of status because his I-130 visa request had been favorably adjudicated. Thus, the only relief Lazar sought was an adjustment of status to permanent resident based on his marriage to a United States citizen.

At the September 9, 2004 hearing, the IJ acknowledged Lazar's withdrawal of his request for asylum and his intent to proceed only on his application for an adjustment of status. However, the IJ held that Lazar had filed a frivolous asylum application and therefore, he was not eligible for an adjustment of status, despite his marriage to a United States citizen. The IJ stated that he had given Lazar an opportunity to explain any discrepancies or implausible aspects of his asylum claim prior to making a frivolousness determination. Lazar did not offer "some nuance or some spin," but rather "conceded that he lied in his application." (J.A. 20.) Moreover, the IJ held that a prompt

recantation by an asylum applicant does not prevent a court from deeming an asylum application frivolous. The IJ stated:

> There needs to be a general deterrent to all potential asylum applicants that they cannot lie to the Court or to the Immigration Service or there would be serious consequences. It also is a specific deterrent in each case before the Court or the Service, and that is to preclude this particular person from lying. Once the lie is done, he shot himself in the foot. And the fact that he then confesses the error of his way is of little and no import to the Court. Public policy dictates that recantation not be a viable option. But even if it were a viable option, the Court notes that the respondent did not recant his application. The respondent got caught with his hand in the cookie jar. What he did not know is the Government had evidence that would demonstrate that his application was fake, phony and fraudulent. This, of course, would be an involuntary recantation, and the Court cannot see why any involuntary recantation, if you want to call it that, would preclude a finding of frivolousness. It would make a mockery of this system. But in any event, the respondent did not recant, he just confessed and it was a forced confession at that.

(J.A. 21.) Accordingly, the IJ denied Lazar's application for adjustment of status.

On February 17, 2006, the BIA affirmed the IJ's decision. The BIA held that the IJ's frivolous determination was "amply supported by the record." (J.A. 2.) The BIA stated that Lazar could not explain away his prevarication by blaming his former counsel because Lazar was caught in his lie after he was represented by new counsel and after the IJ had specifically cautioned him about the consequences of submitting a false asylum application. Further, the BIA stated that "even if there could be circumstances in which a timely retraction of a deliberate material fabrication could be effective to preclude a finding of frivolousness . . . , such a timely retraction did not occur." (J.A. 2.) Lazar timely appealed.

## II. DISCUSSION

### A. Standard of Review

Where the BIA summarily adopts the IJ's decision and also provides commentary of its own, we review both the BIA's decision and the IJ's decision. *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005) (per curiam). We review a finding that an asylum seeker submitted a frivolous application under the substantial-evidence standard for factual findings. *Selami v. Gonzales*, 423 F.3d 621, 626 (6th Cir. 2005). Under the substantial-evidence standard, factual determinations "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (per curiam) (internal quotations and citation omitted). To reverse a factual determination, we "must find that the evidence not only supports a contrary conclusion, but indeed compels it." *Id.* (internal quotations and citation omitted).

### B. Merits

Lazar raises several arguments on appeal, including that (1) he should not be subjected to the harsh finding of frivolousness where he was acting pursuant to the advice of his unscrupulous former counsel, (2) the IJ did not give him a sufficient opportunity to explain the falsehoods in his application, (3) he was denied due process because the IJ held off-the-record conversations with another IJ, and because his case was not adjudicated by a three-person panel of the BIA, (4) he

timely retracted his false statements, which should preclude a frivolous finding, and (5) the case should be remanded to the BIA, in light of a new BIA decision. Each of these will be discussed in turn.

1.          *Legal Principles Applicable to a Finding of Frivolousness*

An asylum application, filed on or after April 1, 1997, such as Lazar's, is frivolous "if any of its material elements is deliberately fabricated." 8 C.F.R. § 1208.20. A number of requirements must be met before an asylum application may be declared frivolous, including (1) notice to the alien of the consequences of filing a frivolous application, (2) a specific finding by the IJ or the BIA that the alien knowingly filed a frivolous application, (3) sufficient evidence in the record to support the finding that a material element of the asylum application was deliberately fabricated, and (4) an indication that the alien has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim. *In re YL*, 2007 BIA LEXIS 14, at \*11 (BIA Apr. 25, 2007). "Because of the severe consequences that flow from a frivolousness finding, the preponderance of the evidence must support an [IJ's] finding that the [petitioner] knowingly and deliberately fabricated material elements of the claim." *Id.* at \*17. Further, the IJ must consider "plausible explanations" offered by the petitioner in considering whether the preponderance of the evidence supports a frivolousness finding. *Id.* Such a finding shall not preclude an alien from seeking withholding of removal, but the "alien shall be permanently ineligible for any benefits under [the INA]" if the alien received notice, *inter alia*, that he would be permanently ineligible for benefits if he filed a frivolous application. *Id.*; 8 U.S.C. §§ 1158(d)(4) & (6).

2.          *Lazar Cannot Blame his Former Counsel*

Lazar contends that but for Dekelaita's "improper actions and unscrupulous advice," he would have become a permanent resident based on his marriage to a naturalized United States citizen, and that therefore Dekelaita rendered ineffective assistance which precludes a finding of frivolousness. (Petr.'s Br. 18.). Further, Lazar argues that he did not "knowingly" make any material misrepresentations in his asylum application, as required by 8 U.S.C. §§ 1158(d)(6) and 8 C.F.R. § 208.20, because he relied upon Dekelaita.

Lazar misses the point. Even if he made misrepresentations in his asylum application based on Dekelaita's advice, he had multiple opportunities to retract these falsehoods and explain them as the product of his attorney's malfeasance. At the November 14, 2003 hearing, Lazar was represented by new counsel who prepared his Second Asylum Application. Prior to signing his application, Lazar received written and oral notice from the IJ that filing a frivolous application could prevent him from receiving any relief under the INA (except for withholding of removal) to which he might otherwise qualify. Lazar testified that he had carefully reviewed his Second Asylum Application with his counsel, that he did not need to make any changes, and that everything set forth in the application was accurate. Lazar then proceeded to testify falsely in response to the IJ's and the Government's questions until the Government presented him with documentation showing that he was in Greece for at least part of the period in which he claimed to have been living in Baghdad. Lazar then admitted his multiple misrepresentations. Rather than attempt to clarify his statements, Lazar subsequently withdrew his asylum application altogether.

Even assuming that Lazar was improperly influenced by Dekelaita, he could, and should, have revealed the falsehoods permeating his First Asylum Application to his new counsel in preparation for filing his Second Asylum Application. In addition, Lazar could have spoken up of his own volition at the November 14 hearing prior to signing his application. For these reasons, Lazar's predicament is of his own making and he cannot hide behind Dekelaita's alleged improprieties.

Further, to the extent that Lazar asserts that Dekelaita's conduct amounted to ineffective assistance of counsel that should relieve him of the IJ's frivolousness finding, we note that Lazar has failed to satisfy the requirements for asserting such a claim. Lazar has not (1) submitted an affidavit detailing Dekelaita's failings, or (2) shown that Dekelaita has been informed of the allegations and given an opportunity to respond. *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988); *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006). Thus, Dekelaita's alleged ineffective assistance does not serve as a basis for granting Lazar relief.

3.	*Lazar Was Given an Opportunity to Explain the Discrepancies Between his Asylum Application and his Hearing Testimony*

Lazar contends that a finding of frivolousness was not warranted where (1) Dekelaita's "involvement in pressuring [him] to make misrepresentations was not fully fleshed out in the course of [the] proceedings," (2) Lazar withdrew his asylum application, and (3) the IJ, by his own admission, did not compare "word for word and line by line" Lazar's Third Asylum Application, filed on December 12, 2003, and ultimately abandoned, with his fraudulent Second Asylum Application. (J.A. 18.)

Lazar's arguments are unavailing. First, for the reasons described above, even if Dekelaita rendered ineffective assistance that prejudiced Lazar, Lazar has not made the necessary factual showing to raise a cognizable ineffective-assistance claim. Moreover, Lazar was represented by new counsel when he filed his Second Asylum Application and affirmed to the IJ that his application was true and correct and needed no amendments.

Second, Lazar's withdrawal of his asylum application did not obviate the need for the IJ to determine whether his false application should be deemed frivolous. Contrary to Lazar's contention, the IJ's frivolousness finding was not mooted by the withdrawal of his application. Indeed, if that were the law, every petitioner seeking relief under the INA would have an incentive to lie in their submissions because there would be no penalties for doing so.

Third, the IJ was not obligated to support his frivolousness finding with a detailed comparison of Lazar's Second and Third Asylum Applications where Lazar never even completed his Third Asylum Application and where he admitted at the November 14, 2003 hearing that he fabricated, *inter alia*, the very basis for his asylum request, namely, the 1997 arrest and beatings he claimed to have suffered in Baghdad.

4.	*Lazar's Due Process Rights Were Not Infringed*

Lazar maintains that his due process rights were violated because (1) the IJ had an off-the-record conversation with a fellow IJ about the standards for making a frivolousness determination, and (2) his appeal to the BIA was decided by a single judge, not a three-judge panel. Once again, Lazar's arguments fail.

First, at the November 14, 2003 hearing, the IJ did allude to a conversation with his colleague about the nature of frivolousness findings, but the discussion was unrelated to Lazar's case, since at the time the discussion occurred the IJ had no way of knowing that the question of frivolousness would arise as to Lazar's application. In addition, the IJ mentioned his colleague only because, as the BIA correctly held, he wanted to direct the parties to examine a particular case that was relevant to the frivolousness issue. At the November hearing, the IJ stated:

> Judge Cassidy has a, a reported case from the circuit he's in. I think
> it's the Eleventh Circuit, that talks about admitting you lied and how
> that doesn't do away with the frivolous warning—I mean, a frivolous
> finding . . . . [H]e was here last week—I think it was last week, or the

> week before—and I talked to him about this issue. And he had, apparently, a similar case here. And the person promptly retracted and he says that I always give them the opportunity of retracting and he wouldn't find it frivolous. So I want to go back and reread that case again . . . . And, I'm sorry. I can't give you the name of the case. But I'm pretty sure it's a, it's a, it's a reported case. I need to go find that case. I think you all need to find it as well . . . .

(J.A. 92.) Thus, there is no basis for concluding that the IJ engaged in any improper ex parte communications with anyone that prejudiced Lazar's case. In fact, the record shows that just the opposite is true: The IJ was aware of applicable governing law that he wanted the parties to consider in their submissions regarding the impact of Lazar's admitted fraud.

As to Lazar's contention that his due process rights were violated because a single BIA judge, rather than a three-judge panel, reviewed his appeal, this too lacks merit. The record amply supports the IJ's determination that Lazar's asylum application was frivolous; there is no reason to think that a three-judge panel was necessary to review this conclusion. Moreover, we have previously rejected identical arguments attacking the BIA's "streamlined review process," including its use of single-judge dispositions. *Lumaj v. Gonzales*, 462 F.3d 574, 576 (6th Cir. 2006) (dismissing argument that BIA's "single-judge review" violated the petitioner's due process rights); *Vasha v. Gonzales*, 410 F.3d 863, 876 (6th Cir. 2005) (concluding that even if judicial review of the BIA's single-judge mechanism were proper, the petitioner had "failed to demonstrate that the case should have been reviewed by a three-member panel of the BIA").

> 5.          *Lazar Did Not Timely Retract his False Statements*

Lazar claims that he timely retracted his misrepresentations at the November 14, 2003 hearing. The record belies his contention. As the IJ found, Lazar in no way voluntarily confessed to his false statements. He came clean only when he was caught red-handed by the Government. It makes no sense to allow a retraction that is forced upon a petitioner to serve as a basis for evading a frivolousness determination. Of course, an alien must still be afforded sufficient opportunity to account for any discrepancies or implausible aspects of the claim. However, because Lazar was afforded such an opportunity, we have no reason to object to the IJ's findings.

In addition, Lazar's argument that any misrepresentations that infected his asylum application are not material to his request for an adjustment of status is wrong. As previously noted, his 1997 arrest and detention in Baghdad, which formed the basis for his asylum application, was a fabrication. The INA is clear that a determination of frivolousness precludes a petitioner from obtaining *any* relief under the INA, except for withholding of removal, which Lazar does not seek.

> 6.          *There is no Basis for a Remand to the BIA*

Finally, Lazar contends that his case should be remanded to the BIA for consideration in light of *In re YL*, 2007 BIA LEXIS 14, a binding decision announced since the BIA disposed of Lazar's appeal. In *YL*, the petitioner explained discrepancies between his first and second asylum applications by stating that his first attorney included incorrect information in his first application, omitted other critical information, and never obtained the petitioner's verification of the contents of the application. The BIA held that, although the IJ "had good reason to be concerned with the plausibility" of the petitioner's new account and the petitioner's "explanations raise[d] as many questions as they answer[ed]," the IJ should have investigated the petitioner's explanation before declaring his application frivolous. *Id.* at *26-28.

*In re YL* is not analogous to the situation here and thus provides no basis for a remand to the BIA. True, Lazar blames his attorney for bungling his First Asylum Application just as the

petitioner in *YL* did, but the similarities end there. The amended application filed by the *YL* petitioner, with new counsel, corrected prior misstatements and included additional pertinent information, and was accompanied by a cover letter outlining the differences in the two applications and explaining that the first application was mishandled by YL's first counsel. *Id.* at *4-6, 25. Thus, YL appears to have acted promptly to correct his first application. Here, Lazar stood by the misrepresentations in his First Asylum Application by including them in his Second Asylum Application, which was prepared by his new counsel; he testified that he had carefully reviewed the application with his new counsel and that its contents were entirely true and correct; and then, when confronted by information presented by the Government belying his claims, Lazar admitted that he had lied.

Finally, the IJ in *YL* did not reveal that she was considering a frivolousness finding and therefore did not probe YL about his first attorney's alleged dereliction in consulting with YL while preparing his first asylum application. *Id.* at *27-28. Here, the IJ continued the hearing for almost a year and invited Lazar to submit additional materials fully explaining the reasons for his misrepresentations. Lazar's response was to withdraw his asylum application and proceed only under his request for adjustment of status. Thus, whereas the IJ in *YL* did not give the petitioner an adequate opportunity to account for the discrepancies between his two applications, the IJ here did.

## III. CONCLUSION

For the reasons described above, we **DENY** Lazar's petition for review.